[Cite as *Church of God in N. Ohio, Inc. v. Levin,* 124 Ohio St.3d 36, 2009-Ohio-5939.]

CHURCH OF GOD IN NORTHERN OHIO, INC., APPELLANT, *v.* LEVIN,

TAX COMMR., APPELLEE.

[Cite as *Church of God in N. Ohio, Inc. v. Levin,*

124 Ohio St.3d 36, 2009-Ohio-5939.]

*Real property taxation — Exemptions — R.C. 5709.12 — Use of office building for administrative support of public worship not qualifying as charitable use.*

(No. 2008-2462 — Submitted August 25, 2009 — Decided November 18, 2009.)

APPEAL from the Board of Tax Appeals, No. 2007-N-102.

_____

**Per Curiam.**

{¶ 1}  Appellant, Church of God in Northern Ohio, Inc. ("COGNO"), appeals from a decision of the Board of Tax Appeals ("BTA") that affirmed the Tax Commissioner's denial of COGNO's application to exempt from taxation a parcel of real property in Summit County.  The parcel is improved with an office building of between 11,000 and 12,000 square feet constructed in 2000-2001.  The Tax Commissioner denied the exemption on the principal ground that the "property is being used for purposes that are merely supportive of public worship."  On appeal, the BTA affirmed the commissioner's denial of the exemption.

{¶ 2}  Before this court, COGNO renews its argument that the "building is purely an administrative office building used by regional church officials to oversee and assist its member congregations," and it characterizes the member congregations as carrying out "charitable purposes." We disagree, and we therefore affirm the decision of the BTA.

**Facts**

**{¶ 3}** On November 14, 2003, COGNO filed an exemption application for its Summit County office building that sought exemption from real property taxation for tax year 2003 and remission of taxes for tax year 2002. The application cited R.C. 5709.12 as the statutory basis for exemption and characterized the use of the property as "State Executive Offices and Ministry Training Center" and as "Office and support staff for Administrative Bishop, who oversees 121 congregations from I-70 north to Lake Erie." According to the application, the building contained "[c]onference rooms and classrooms used for church leadership meetings and ministerial teaching and training." Also in the building were offices for "Youth and Christian Education, Women's Ministries," and "Evangelism and Home Missions." The application summed up the use of the property as "[f]acilitating the proclamation of the Gospel of Jesus Christ and supporting public worship."

**{¶ 4}** By entry dated December 8, 2006, the Tax Commissioner denied the application. Relying on *Christian Church of Ohio v. Limbach* (1990), 53 Ohio St.3d 270, 271, 560 N.E.2d 199, the commissioner found that the property was being used "for purposes that are merely supportive of public worship" and therefore did not qualify for exemption under R.C. 5709.07(A)(2). Although acknowledging that COGNO's application invoked R.C. 5709.12 rather than 5709.07, the commissioner ruled that under either statute, "property used as the administrative headquarters for a church or congregation is taxable."

**{¶ 5}** COGNO appealed to the BTA. Its notice of appeal identifies as the sole issue "whether or not the property is being used exclusively for charitable purposes"; completely absent is any assertion that COGNO should enjoy exemption by virtue of qualifying itself as a "charitable institution" pursuant to R.C. 5709.121.

**{¶ 6}** At the BTA hearing, COGNO presented the testimony of John D. Childers, who identified himself as an "ordained bishop" and the "administrative

2

bishop" for COGNO. In that capacity, Childers oversees the activities within the northern Ohio region, which had 126 churches with pastors and seven mission churches that were not yet fully operating. Childers characterized himself as "responsible for the spiritual well being, the growth, the oversight of all the ministries in Northern Ohio." Childers supervises a staff of administrators: a director of youth and Christian education, a coordinator for girls' clubs, and an administrator for women's ministries. Also working on site are five support staff members: two administrative assistants, a production coordinator, an office director, and a receptionist.

**{¶ 7}** According to Childers, the regional office engages in the following activities:

- Prepares materials regarding prayer that it sends out to the local churches.
- Transmits information regarding worship from the international organization to the local churches.
- Facilitates participation of local congregations in global outreach programs.
- Helps start new churches within the region.
- Hosts pastoral covenant meetings as continuing education and development for local pastors.
- Arranges donations and services among churches in the region.

**{¶ 8}** COGNO funds its operations with a prescribed portion of the tithes collected by the local churches. COGNO acquired the parcel at issue in 1997, demolished a previously existing house, and built the current office building, which opened for business in 2002.

**{¶ 9}** The BTA analyzed the record and concluded that the primary use of the offices was administrative and corporate in nature, with church

administration activities predominating, such as "employee and church member training, board of director's meetings, employee oversight, treasury duties, secretarial support, and training support." *Church of God in N. Ohio, Inc. v. Wilkins* (Nov. 25, 2008), BTA No. 2007-N-102, at 11. The BTA affirmed the Tax Commissioner's denial of the exemption, and we now affirm the decision of the BTA.

### Analysis

{¶ 10} COGNO seeks a real property tax exemption for a building primarily used to provide administrative support to the local churches of its denomination. Two tax exemptions are pertinent to the analysis of this appeal even though only one is claimed. R.C. 5709.07(A)(2) exempts "[h]ouses used exclusively for public worship, the books and furniture in them, and the ground attached to them that is not leased or otherwise used with a view to profit and that is necessary for their proper occupancy." R.C. 5709.12(B) exempts "[r]eal and tangible personal property belonging to institutions that is used exclusively for charitable purposes."

{¶ 11} We have held that a religious denomination's regional headquarters does not qualify for exemption under R.C. 5709.07(A)(2), because that exemption extends only to property that "facilitates the public worship occurring *on the premises*." (Emphasis added.) *Christian Church of Ohio v. Limbach* (1990), 53 Ohio St.3d 270, 271, 560 N.E.2d 199. By contrast, where an institution that engages in charitable activity has sought to exempt its administrative offices, we have typically recognized a charitable exemption for those offices even if it appears that some portion of the institution's charitable activity takes place off premises. See *Community Health Professionals, Inc. v. Levin*, 113 Ohio St.3d 432, 2007-Ohio-2336, 866 N.E.2d 478, ¶ 2–4, 23 (charitable institution that provides home healthcare could exempt its administrative offices consistently with R.C. 5709.121); *Girl Scouts–Great Trail*

*Council v. Levin*, 113 Ohio St.3d 24, 2007-Ohio-972, 862 N.E.2d 493, ¶ 2 (recognizing an exemption for a building containing regional administrative offices of the Girl Scouts); *Herb Soc. of Am., Inc. v. Tracy* (1994), 71 Ohio St.3d 374, 376, 643 N.E.2d 1132 (organizational headquarters of a society engaged in charitable diffusion of knowledge to the public constituted the exempt offices of a charitable institution).

{¶ 12} In order to avoid the more limited scope of the public-worship exemption, COGNO seeks exemption solely under R.C. 5709.12(B). The Tax Commissioner made a finding that COGNO's use of the property at issue was "supportive of public worship," a finding that COGNO did not contest and that the record supports. In that context, the commissioner stated that "[w]hether the applicant seeks exemption pursuant to R.C. 5709.07 or R.C. 5709.12, property used as the administrative headquarters for a church or congregation is taxable."

{¶ 13} For its part, the BTA analyzed COGNO's claim in terms of the "administrative and corporate function" exercised by COGNO on the property, as established by the evidence. The BTA held that the predominance of that function in support of church-related activity defeated the claim of exclusive charitable use.

{¶ 14} As discussed, COGNO contests this determination by pointing to cases that appear to recognize a broader exemption for the administrative activities associated with *charitable* purposes. Relying on those cases, COGNO argues that its "building is purely an administrative office building used by regional church officials to oversee and assist its member congregations in carrying out their charitable purposes."

{¶ 15} We agree with COGNO that its claim constitutes the type of claim that the court did not reach in *Christian Church*, 53 Ohio St.3d 270, 560 N.E.2d 199. In that case, we specifically noted that only the claim of exemption under R.C. 5709.07, not the claim under R.C. 5709.12, was before us. Id. at 271, fn. 1.

We also concur in the view that the predominance of administrative activity does not by itself defeat a claim of exemption under R.C. 5709.12(B), if the activity is ancillary to charitable endeavors.

{¶ 16} Nonetheless, our review of the statutes and the pertinent case law persuades us that the commissioner and the BTA properly denied the exemption because, contrary to COGNO's assertion, neither the activities conducted at the site nor the public worship conducted by the member congregations constitutes charitable activity.

*COGNO's primary use of its property does not fall*
*within the recognized categories of charitable use*

{¶ 17} In its second proposition of law, COGNO characterizes itself as an "institution using its real property exclusively for the lawful advancement of religion." As such, COGNO believes that its use of the property satisfies the two prerequisites for exemption under R.C. 5709.12(B). [1] *Highland Park Owners, Inc. v. Tracy* (1994), 71 Ohio St.3d 405, 406-407, 644 N.E.2d 284 ("to grant exemption under R.C. 5709.12, the arbiter must determine that (1) the property belongs to an institution, and (2) the property is being used exclusively for charitable purposes"). No one disputes that COGNO can qualify as an institution that owns the property at issue. As a result, we must determine whether COGNO can qualify its use of the property as charitable use.

---

1. The BTA held that it had no jurisdiction to consider a claim of exemption under R.C. 5709.121 because the notice of appeal COGNO filed at the BTA did not specify error in that regard. *Church of God in N. Ohio, Inc. v. Wilkins* (Nov. 25, 2008), BTA No. 2007-N-102, at 6, fn. 1. We agree with the BTA's holding, and accordingly COGNO's claim of any expanded exemption under the provisions of R.C. 5709.121 is jurisdictionally barred. But the jurisdictional bar is immaterial to the gravamen of COGNO's appeal; indeed, COGNO cites cases that address R.C. 5709.121 primarily to establish that *its use of the property* is charitable, not to establish that COGNO itself is a charitable institution. See *True Christianity Evangelism v. Tracy* (1999), 87 Ohio St.3d 48, 51, 716 N.E.2d 1154 (if an institution is religious and not charitable, its claim of exemption must be considered under R.C. 5709.12(B) in terms of its use of the property).

{¶ 18} Because the statutes do not define charity or charitable use, our case law has supplied the deficiency. Charity, we have held, "is the attempt in good faith, spiritually, physically, intellectually, socially and economically to advance and benefit mankind in general, or those in need of advancement and benefit in particular, without regard to their ability to supply that need from other sources, and without hope or expectation, if not with positive abnegation, of gain or profit by the donor or by the instrumentality of the charity." *Planned Parenthood Assn. v. Tax Commr.* (1966), 5 Ohio St.2d 117, 34 O.O.2d 251, 214 N.E.2d 222, paragraph one of the syllabus.

{¶ 19} We have recognized specific activities as constituting charitable ones in the proper context. Thus, the provision of medical or ancillary healthcare services qualifies as charitable if those services are provided on a nonprofit basis to those in need, without regard to race, creed, or ability to pay. *Vick v. Cleveland Mem. Med. Found.* (1965), 2 Ohio St.2d 30, 31 O.O.2d 16, 206 N.E.2d 2, paragraph two of the syllabus; cf. *White Cross Hosp. Assn. v. Bd. of Tax Appeals* (1974), 38 Ohio St.2d 199, 201, 67 O.O.2d 224, 311 N.E.2d 862 (private medical offices adjoining hospital on hospital's property did not share hospital's tax exemption). Also, the nonprofit provision of educational services constitutes charitable activity in a proper case. See *Gerke v. Purcell* (1874), 25 Ohio St. 229, paragraph four of the syllabus (charity includes "endowments for the advancement of learning, or institutions for the encouragement of science and art"); *Cleveland Bible College v. Bd. of Tax Appeals* (1949), 151 Ohio St. 258, 39 O.O. 70, 85 N.E.2d 284; *Cincinnati Community Kollel v. Levin*, 113 Ohio St.3d 138, 2007-Ohio-1249, 863 N.E.2d 147, ¶ 15, 16 (institution that taught religious doctrine to students qualified as "educational institution" for purposes of R.C. 5709.121).

{¶ 20} Similarly, disseminating useful information without expectation of profit may also qualify as charitable. *Herb Soc.*, 71 Ohio St.3d at 376, 643

N.E.2d 1132 ("The dissemination of useful information to benefit mankind is, traditionally, charity"); *Battelle Mem. Inst. v. Dunn* (1947), 148 Ohio St. 53, 60, 35 O.O. 9, 73 N.E.2d 88. The latter category encompasses the dissemination of distinctly religious messages to a general public, where the activity has been instigated for spiritual improvement and without expectation of profit. *True Christianity Evangelism v. Zaino* (2001), 91 Ohio St.3d 117, 119-120, 742 N.E.2d 638.

{¶ 21} COGNO argues generally that its activities fall within the definition of charity. In making this contention, COGNO focuses on certain pastoral educational activities at the property and emphasizes the extent to which its religious activity involves the proclamation of the Gospel to the world. COGNO seeks support from the court's pronouncement that "an institution used exclusively for the lawful advancement of education and of religion is an institution used exclusively for charitable purposes." *Am. Commt. of Rabbinical College of Telshe, Inc. v. Bd. of Tax Appeals* (1951), 156 Ohio St. 376, 46 O.O. 217, 102 N.E.2d 589, paragraph one of the syllabus.

{¶ 22} But this argument fails because the character of the property's use must be determined in light of its *primary* use, not secondary or ancillary activities. *True Christianity*, 91 Ohio St.3d at 120-121, 742 N.E.2d 638. In this case the record leaves no doubt about primary use. COGNO itself stated in its exemption application that the property is used by "[o]ffice and support staff for Administrative Bishop, who oversees 121 congregations from I-70 north to Lake Erie, including 400 ordained ministers and 27,000+ parishioners," a use properly characterized as "supporting public worship." Again, in its brief, COGNO states that the property consists of a building that is "purely an administrative office building used by regional church officials to oversee and assist its member congregations." These averments cannot be reconciled with a primary use that

would bring the property at issue within the ambit of those cases in which a formal, degree-granting school was being operated on the property.

{¶ 23} COGNO's reliance on our holding in *True Christianity* is also mistaken. In that case, the BTA found that the primary use of a house was "an evangelistic one" involving the dissemination of literature and the posting of messages that urged readers to abide by spiritual and moral precepts. *True Christianity Evangelism v. Tracy* (Sept. 25, 1998), BTA No. 96-K-904, 1998 WL 683022, at 2; *True Christianity Evangelism v. Tracy* (Jan. 14, 2000), BTA No. 96-K-904, 2000 WL 31781, at 3, 5. Based upon this finding, we concluded that the property qualified for exemption inasmuch as the provision of spiritual enlightenment to the public without monetary charge fell within the *Planned Parenthood* definition of charity. *True Christianity*, 91 Ohio St.3d at 120, 742 N.E.2d 638. Accord *Am. Humanist Assn., Inc. v. Bd. of Tax Appeals* (1963), 174 Ohio St. 545, 23 O.O.2d 210, 190 N.E.2d 685 (headquarters of organization devoted to publishing literature concerning human progress, values, and welfare held exempt).

{¶ 24} COGNO attempts to equate its own situation with that involved in *True Christianity* by characterizing its "charitable purpose" as "the spread of a religious message." But as discussed, the BTA correctly found that as its primary use of the property, COGNO engaged in administrative and corporate activities in support of public worship. *Church of God in N. Ohio*, BTA No. 2007-N-102, at 11. Quite simply, the use of the property at issue in *True Christianity* involved no direct connection with public worship. The doctrine of *True Christianity* therefore does not apply to the present case.

{¶ 25} Because COGNO's primary use of the property involves activities that support worship at the local level, COGNO can prevail only by establishing a stronger form of its argument: it must rely on the proposition that the public

worship conducted at the local churches can itself be viewed as constituting charitable activity. We now address that contention.

*Public worship does not per se constitute charitable activity*

{¶ 26} In spite of its apparent breadth, the definition of charity does not encompass public worship. We have defined public worship as the "open and free celebration or observance of the rites and ordinances of a religious organization." *Faith Fellowship Ministries, Inc. v. Limbach* (1987), 32 Ohio St.3d 432, 513 N.E.2d 1340, paragraph one of the syllabus. As discussed, charity involves the provision of goods or services or knowledge "to advance and benefit mankind in general, or those in need of advancement and benefit in particular"; in other words, charity looks outward toward a general and indefinite public that the institution will serve. *Planned Parenthood*, 5 Ohio St.2d 117, 34 O.O.2d 251, 214 N.E.2d 222, paragraph one of the syllabus. Although a religious congregation may welcome all to join in the "celebration or observance" of its "rites and ordinances," and although that activity confers a spiritual benefit on its participants, the worship of any particular church, synagogue, mosque, or other temple will typically share a characteristic with fraternal associations: it inevitably focuses on serving the spiritual needs of those participants who are already to a greater or lesser degree members of the congregation, or at least of the larger denomination. See *Olmsted Falls Bd. of Edn. v. Tracy* (1997), 77 Ohio St.3d 393, 397, 674 N.E.2d 690 (organization's activities that primarily benefit members rather than general public do not qualify as charitable). And while worship often encourages its participants to engage in other distinctly charitable activities as part of the spiritual benefit that it confers, that does not establish that the worship service itself constitutes charitable activity.

{¶ 27} Our determination that public worship does not fall within the definition of charity comports with the constitutional and statutory provisions that control property-tax exemption, as well as the case law that applies those

provisions. Both the Ohio Constitution and the exemption statutes have long distinguished between exempting public worship and exempting charitable use. The Constitution of 1851 instituted provisions for taxation at Article XII, and Section 2 of that article enumerated several appropriate subjects for exemption, listing as separate items "houses used exclusively for public worship" and "institutions of purely public charity." In its current form, Section 2 of Article XII lists "houses used exclusively for public worship" and "institutions used exclusively for charitable purposes." By adopting these provisions as part of their constitution, the people of Ohio have explicitly recognized two equally noble and socially important endeavors as the bases for separate exemptions from property taxation.

{¶ 28} The statutes have mirrored the constitutional distinction, creating separate exemptions. In their current form, the statutes on the one hand exempt "[h]ouses used exclusively for public worship, the books and furniture in them, and the ground attached to them that is not leased or otherwise used with a view to profit and that is necessary for their proper occupancy, use and enjoyment" at R.C. 5709.07(A)(2), while on the other hand exempting "[r]eal and tangible personal property belonging to institutions that is used exclusively for charitable purposes" at R.C. 5709.12(B).

{¶ 29} As already discussed, the proper analysis of the issue in this case requires us to recognize the scope and limitation of the public-worship exemption at R.C. 5709.07(A)(2). Our cases have recognized and effectuated the limited character of that exemption, holding that to qualify under that provision property "must be used in a principal, primary, and essential way to facilitate the public worship" and that accordingly "uses which are merely supportive of public worship may not be exempted." *Faith Fellowship Ministries*, 32 Ohio St.3d at 436, 513 N.E.2d 1340, and paragraph two of the syllabus.

{¶ 30} The constitutional and statutory provisions just cited refute COGNO's contention that public worship may be equated with a charitable dissemination of religious information or viewed as equivalent to the charitable provision of spiritual edification to mankind in general. First, if COGNO's theory were correct, there would as a general matter be no need for a separate exemption for houses of public worship, because such buildings would already be exempt as "real property used exclusively for charitable purposes." The second point is a corollary to the first: if public worship constituted a charitable use, then the limited scope the legislature prescribed for the exemption of houses of public worship could be avoided simply by claiming exemption under the charitable-use statute rather than the house-of-public-worship provision itself. Taken together, these circumstances would amount to a violation of the precept that we should construe statutes to give effect to all the enacted language. See R.C. 1.47(B); *State ex rel. Bohan v. Indus. Comm.* (1946), 147 Ohio St. 249, 251, 34 O.O. 151, 70 N.E.2d 888 (recognizing the "duty of courts to accord meaning to each word of a leglislative [sic] enactment if it is reasonably possible so to do"). Indeed, we have recognized a general principle that a property owner may not evade the limitations imposed with respect to a specific tax exemption by claiming exemption under a broad reading of other exemption statutes. *Rickenbacker Port Auth. v. Limbach* (1992), 64 Ohio St.3d 628, 631-632, 597 N.E.2d 494.

{¶ 31} Also supportive of this conclusion is the reasoning in *Watterson v. Halliday* (1907), 77 Ohio St. 150, 82 N.E. 962. That case addressed a claim of exemption for parish houses adjunct to their respective churches, in which the priests both resided and performed many church-related activities that included explicitly administrative functions. Id. at 164-165, 171. One theory advanced in support of exemption was that the religious denomination constituted an "institution[ ] of purely public charity" under the former statutory language. 91 Ohio Laws 216. The court rejected that claim in part because the denomination as

an institution had as its "*chief* and *primary* object and purpose the teaching and extending of its recognized form of religious belief and worship into all parts of the world." (Emphasis sic.) Id. at 179. Because the chief and primary object of the religious denomination lay in promoting a particular "form of religious belief and worship," it could not qualify as an institution of "purely" public charity, in spite of its many undoubtedly charitable endeavors. The necessary but unstated premise of that decision is that the activity of public worship by itself does not constitute a charitable activity, and that premise militates against COGNO's argument in the present case. Accord *Hubbard Press v. Tracy* (1993), 67 Ohio St.3d 564, 566, 621 N.E.2d 396 (nonprofit use of property exclusively to print items for use by local church congregations did not constitute charitable use of the property).

{¶ 32} In this context, it is important to state the limits of our holding. Our disposition of this appeal in no way implies that an institution such as COGNO may not obtain an exemption for property when it proves that its use of the property actually constitutes charitable use. If, for example, COGNO purchased a separate parcel on which it operated, as a primary use, a soup kitchen, or on which it distributed (again, as a primary use) clothing to the poor, COGNO would stand on equal footing with any other institution in applying to exempt the property devoted to those purposes. See *True Christianity Evangelism v. Tracy* (1999), 87 Ohio St.3d 48, 51, 716 N.E.2d 1154. Our holding in this case is limited to property primarily used to support public worship that is conducted at other locations by local congregations: we hold that such use does not by itself constitute a charitable use of real property.

## Conclusion

{¶ 33} In light of the foregoing analysis, the Tax Commissioner correctly determined that whether an applicant "seeks exemption pursuant to R.C. 5709.07 or R.C. 5709.12, property used as the administrative headquarters for a church or

congregation is taxable." It follows that the commissioner properly denied the exemption and that the BTA acted in accordance with the law when it affirmed that denial. We therefore affirm the BTA's decision.

Decision affirmed.

MOYER, C.J., and O'CONNOR, LANZINGER, and CUPP, JJ., concur.

PFEIFER, LUNDBERG STRATTON, and O'DONNELL, JJ., dissent.

_____

**LUNDBERG STRATTON, J**., **dissenting.**

{¶ 34} I believe that the Church of God in Northern Ohio ("COG") uses its property exclusively for the charitable purposes of providing public worship and community programs and is therefore exempt from taxation under R.C. 5709.12(B). Accordingly, I respectfully dissent.

{¶ 35} Under R.C. 5709.12, property is exempt from taxation if "(1) the property belongs to an institution, and (2) the property is being used exclusively for charitable purposes." *Highland Park Owners, Inc. v. Tracy* (1994), 71 Ohio St.3d 405, 406-407, 644 N.E.2d 284. It is undisputed that COG is an institution. The question here is whether COG uses the property exclusively for charitable purposes.

### Property used for administrative support of off-premises charitable activities qualifies for a charitable tax exemption

{¶ 36} In determining whether a property qualifies for a charitable-use tax exemption, the analysis usually involves examining the use of the property that the applicant seeks to exempt from taxation. See *Case W. Res. Univ. v. Wilkins*, 105 Ohio St.3d 276, 2005-Ohio-1649, 825 N.E.2d 146 (property leased by a college to a private sorority to house only sorority members was not exempt from taxation, because the use was not an educational use under R.C. 5709.121(A)(2)). However, on several occasions this court has recognized that property used by an institution for administrative support of off-premises charitable activities qualifies

for a charitable exemption. *Girl Scouts–Great Trail Council v. Levin*, 113 Ohio St.3d 24, 2007-Ohio-972, 862 N.E.2d 493 (use of Girl Scouts' administrative building to support scouting activities constituted charitable use); *Community Health Professionals v. Levin*, 113 Ohio St.3d 432, 2007-Ohio-2336, 866 N.E.2d 478 (use of an administrative building by a nonprofit company to manage and support subsidized in-home care constituted charitable use); *Herb Soc. of Am., Inc. v. Tracy* (1994), 71 Ohio St.3d 374, 376, 643 N.E.2d 1132 (the Herb Society sponsored numerous charitable activities that occurred off the premises, including organizing and conducting local symposiums and maintaining herb gardens throughout the United States).

{¶ 37} In the instant case, the BTA determined that "[a]s appellant is a church, all of its support functions will necessarily be related to religion and the promotion of religion." *Church of God in N. Ohio, Inc. v. Wilkins* (Nov. 25, 2008), BTA No. 2007-N-102, at 11. Thus, the question becomes whether the activities performed in COG's churches constitute charitable activities.

### Preparation and dissemination of a religious message is a charitable activity

{¶ 38} We have held, " '[C]harity,' in the legal sense, is the attempt in good faith, *spiritually*, physically, intellectually, socially and economically to advance and benefit mankind in general, or those in need of advancement and benefit in particular, without regard to their ability to supply that need from other sources, and without hope or expectation, if not with positive abnegation, of gain or profit by the donor or by the instrumentality of the charity." (Emphasis added.) *Planned Parenthood Assn. of Columbus, Inc. v. Tax Commr*. (1966), 5 Ohio St.2d 117, 34 O.O.2d 251, 214 N.E.2d 222, paragraph one of the syllabus.

{¶ 39} In *True Christianity Evangelism v. Zaino* (2001), 91 Ohio St.3d 117, 742 N.E.2d 638, a religious organization sought a tax exemption under R.C.

5709.12(B) for a house that it used to prepare and disseminate religious materials. Jeffery Botzko, the organization's president, testified:

**{¶ 40}** " 'My goal is to inspire, enthuse, or to badger people into actually reading the Bible and finding out what it says and living up to its standards. Or even apart from that, just encourage them to seek the highest moral standards they can from whatever source they will accept. Like I tried to encourage people who believe in the Koran to find the best moral standards in it and see if there is higher things in the Bible that you can go above what the Koran says.

**{¶ 41}** " 'I try to *promote* true *Christianity*, but if I can't do that, I still try to promote the best moral standards part.' " (Emphasis added.) Id. at 119.

**{¶ 42}** The BTA in *True Christianity Evangelism* found that the primary use of the property was "(1) 'an evangelistic one' and (2) for 'the preparation and dissemination of a religious message.' " Id. We held: "The information disseminated by appellant attempts to encourage people to read the Bible and to live up to its moral standards. These efforts are a good-faith attempt to disseminate information to spiritually advance and benefit mankind in general. Under the definition of charity followed by this court, appellant's activities constitute charitable purposes." Id. at 120. Thus, we held that appellant's property was exempt from taxation under R.C. 5709.12(B).

**{¶ 43}** In the instant case, the COG uses its churches for worship and to promote certain outreach programs. I believe that these activities and the activities in *True Christianity Evangelism* are similar both in substance and in purpose. In both, the applicant prepares and disseminates a religious message. And both do so for the purpose of spreading the gospel. Moreover, in the instant case, the outreach programs, such as the backpack program, provide assistance to needy children by providing them with backpacks and school supplies, which is a charitable activity. Thus, I would hold that the activities undertaken in COG's

churches constitute charitable activities akin to those in *True Christianity Evangelism.*

{¶ 44} The majority reasons that public worship is not per se a charitable activity in large part because worship reaches primarily church members and not the general public. In so holding, the majority relies on *Olmsted Falls Bd. of Edn. v. Tracy* (1997), 77 Ohio St.3d 393, 397, 674 N.E.2d 690, for the proposition that an "organization's activities that primarily benefit members rather than general public do not qualify as charitable."

{¶ 45} In *Olmsted Falls*, the Donauschwaben German American Cultural Center ("Donauschwaben") owned 20 acres of land, which contained a small lake, soccer fields, tennis courts, a picnic area, a playground, and several buildings, including a cultural center. Id. at 393. The cultural center contained a bar and lounge, an outdoor beer garden, a dance floor, a bowling alley, meeting rooms, etc. Id. Donauschwaben organized many groups including a soccer club, tennis club, band, ski club, bowlers' club, etc. Membership was limited to 1,000 members and members had to pay dues. Id. at 393-394.

{¶ 46} Donauschwaben sought an exemption for the property under R.C. 5709.12 and 5709.121. Id. at 395. The court held that Donauschwaben did not use the property exclusively for charitable purposes primarily for two reasons: (1) participation in Donauschwaben's activities was limited to dues-paying members and (2) social and fraternal events such as dinners and carnivals are not charitable activities. Id. at 397.

{¶ 47} I believe that *Olmsted Falls Bd. of Edn.* is distinguishable from the instant case because COG's churches are open to the public and no one attending church is required to pay any dues or fees. Further, COG's churches are not social clubs but are places of worship in which to spread the gospel and are also used to provide outreach programs that assist the needy. Finally, COG seeks to spread the gospel beyond the doors of existing churches. The bishop for COG

testified that the church wants "to reach as many people as we can with the gospel and the message." He stated that "[t]he local churches have an outreach mentality." "[W]e encourage our local constituents to be part of the global aspect, even though they are from a local standpoint, but from a global standpoint, to become involved in the world of evangelism. We do have a very strong emphasis on that." The bishop stated, "We continually are preparing and projecting where we want to plant churches in communities that will make an impact and a difference. So we have an ongoing program of resources that we develop for that."

{¶ 48} Moreover, in *Herb Soc. of Am., Inc. v. Tracy*, we held: "So long as an institution is operated without any view to profit and exclusively for a charitable purpose, it is a charitable institution. It need not be open generally to the public if it promotes the lawful advancement of the charitable purpose." 71 Ohio St.3d at 376, 643 N.E.2d 1132, citing *Am. Commt. of Rabbinical College of Telshe, Inc. v. Bd. of Tax Appeals* (1951), 156 Ohio St. 376, 46 O.O. 217, 102 N.E.2d 589, paragraphs one and two of the syllabus. Even though membership in the Herb Society was not generally open to the public, the court nevertheless held that it was engaged in a charitable activity by tending herb gardens, lecturing, and distributing literature, sponsoring symposiums, and endowing research grants, which resulted in the betterment of mankind. Id. Similarly, even though the churches have members, their services are open to the public and result in the betterment of mankind by spreading the gospel to the public and by providing assistance to the needy.

### Conclusion

{¶ 49} I would hold that COG's property plays an integral role in supporting the charitable activities of public worship and providing outreach programs within the congregation's churches. Consequently, I would hold that

COG's property is used exclusively for a charitable purpose, and therefore is exempt from taxation under R.C. 5709.12(B). Therefore, I respectfully dissent.

PFEIFER and O'DONNELL, JJ., concur in the foregoing opinion.

———————————

Kennedy & Associates Co., L.P.A., David R. Kennedy, and Alan B. Forrest, for appellant.

Richard Cordray, Attorney General, and Ryan P. O'Rourke, Assistant Attorney General, for appellee.

———————————